## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

PENNY OCTOBER CHANDLER,      )
                                      )
          Claimant,        )
                                      )
v.                                 )        CIVIL ACTION NO.
                                      )        4:17-CV-1945-KOB
                                      )
NANCY A. BERRYHILL,       )
ACTING COMMISSIONER OF   )
SOCIAL SECURITY           )
                                      )
         Respondent.     )

## <u>MEMORANDUM OPINION</u>

## I.     INTRODUCTION

Penny Chandler, the claimant, protectively filed a Title II application for disability insurance benefits and a Title XVI application for supplemental security income on June 30, 2014. (R. 22, 244-256). In both applications, the claimant alleged an onset date of September 30, 2013. (R. 22, 251). The Commissioner denied the claims on October 10, 2014, and the claimant filed a written request for a hearing on December 12, 2014. (R. 170, 175, 41-42). The Administrative Law Judge held a video hearing on August 31, 2016. (R. 96). In a decision dated January 12, 2017, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and was, therefore, ineligible for social security benefits. (R.34).

After the ALJ's decision, the claimant appealed to the Appeals Council and submitted additional evidence, including medical records from Dr. Steven Knighten and a psychological evaluation from Dr. David Wilson. On September 25, 2017, the Appeals Council denied the claimant's request for review. (R. 1). In this denial, the Appeals Council stated that it declined to

review the medical records from Dr. Knighten because the evidence did not show a reasonable probability that it would change the outcome of the decision.[1] (R. 2). Additionally, the Appeals Council declined to review the evidence from Dr. Wilson because it did not relate to the period at issue. (R. 2). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II.    ISSUES PRESENTED

The claimant presents the following issues for appeal:

1. whether the Appeals Council properly declined to review evidence that the claimant submitted  after the ALJ hearing;

2. whether substantial evidence supports the reasons the ALJ gave little weight to Dr. Fleming's consultative examination;

3. whether sufficient evidence exists in the record for the ALJ to properly determine that the claimant could perform her past work as a housekeeper; and

4. whether the vocational expert's testimony provides substantial evidence to support the ALJ's finding that jobs exist in the national economy that the claimant can perform.

## III.    STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports

---

[1] The claimant does not challenge the Appeals Council decision not to review records from Dr. Knighten.

his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.1987).

"No . . . presumption of validity attaches to the [ALJ's] legal conclusions, including determination of the proper standards to be applied in evaluating claims.*" Walker*, 826 F.2d at 999. This court does not review the ALJ's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [ALJ]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its

entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV.    LEGAL STANDARDS

### *Reviewing Post-Hearing Evidence*

With a few exceptions, a claimant is allowed to present new evidence at each stage of the administrative process. *Washington v. Soc. Sec. Admin., Comm'r,* 806 F.3d 1317, 1320 (11th Cir. 2015); *See also* 20C.F.R. § 404.900(b). When the claimant submits evidence to the Appeals Council that is "new, material, and chronologically relevant," the Appeals Council must consider it. *Id.* When the Appeals Council erroneously refuses to consider evidence, it commits legal error and remand is appropriate. *Id.* at 1321. Whether evidence meets the new, materially, and chronologically relevant standard is a question of law subject to de novo review. *Id.*

New evidence that the Appeals Council should consider is evidence that is non-cumulative. *Clough v. Soc. Sec. Admin., Comm'r*, 636 F. App'x 496, 498 (11th Cir. 2016) (holding that evidence was not new where a post-hearing evaluation included the same diagnoses as those of pre-hearing evaluations). Evidence is material if a reasonable possibility exists that the evidence would change the administrative result. *Washington*, 806 F.3d at 1321. Finally, medical examinations that are conducted after an ALJ's decision may still be chronologically relevant if they relate back to a time on or before the ALJ's decision. *Hunter v. Soc. Sec. Admin., Comm'r*, 705 F. App'x 936, 940 (11th Cir. 2017).

### *Articulating the Weight Given to Physicians' Opinions*

The ALJ must make clear the weight accorded to each item of evidence and the reasons for the decision so that the reviewing court may determine whether the decision is based on substantial evidence. *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir.

2011). The failure to specifically articulate that weight is a reversible error. *Cowart v. Schweiker*, 662 F.2d 731,735 (11th Cir. 1981).  When evaluating such evidence, the ALJ must give "substantial weight" to the opinion of the claimant's treating physician "unless good cause exists for not heeding to the treating physician's diagnosis." *Edward v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *See also* 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to medical opinions from . . . treating sources, since these sources are likely to be . . . able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from . . . individual examinations, such as consultative examinations or brief hospitalizations.").  The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Skyrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

### Determining Whether a Claimant Can Perform Past Relevant Work

The claimant bears the burden of demonstrating an inability to perform her past relevant work. *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987). However, the ALJ has an obligation to develop a full and fair record. *Id.* "Where there is no evidence of the physical requirements and demands of the claimant's past work and no detailed description of the required duties was solicited or proffered, . . . [the ALJ] cannot properly determine whether the claimant has the residual functional capacity to perform his past relevant work. *Id.* The record must contain detailed information about strength, endurance, manipulative ability, mental demands and other job requirements. SSR 82-62, 1982 WL 31386 at *3; *See also Lucas v. Sullivan*, 918 F.2d 1567, 1574 n.3 (11th Cir. 1990) (noting that to support a conclusion that the claimant can return to his or her past work, "the ALJ must consider all the duties of that work and evaluate [his or] her ability to perform them in spite of [the claimant's] impairments").

Statements by the claimant regarding her past work are generally sufficient. *Id.* Finally, in making this determination, the ALJ may use the testimony of a vocational expert. *Hanes v. Comm'r Soc. Sec. Admin.*, 130 F. App'x 343, 346 (11th Cir. 2005).

*Using a Vocational Expert's Testimony as Substantial Evidence*

An ALJ may rely on the testimony of a vocational expert to establish that the claimant has the ability to adjust to other work in the national economy. *Ritcher v. Comm'r of Soc. Sec.*, 379 F. App'x 959, 960 (11th Cir. 2010). When relying on such testimony, the ALJ must pose hypothetical questions to the vocational expert that encompass all of the claimant's impairments. *Id.* If the ALJ presents the vocational expert with an inadequate hypothetical, the vocational expert's testimony will not constitute substantial evidence. *Jacobs v. Comm'r of Soc. Sec.*, 520 F. App'x 948, 950 (11th Cir. 2013). While not every symptom need be found in the ALJ's hypothetical, all of the claimant's impairments must be included for the vocational expert's testimony to constitute substantial evidence. *Ritcher*, 379 F. App'x at 960. Hypotheticals that "implicitly account" for the claimant's limitations are sufficient. *Winschel,* 631 F.3d at 1181.

## V.    FACTS

The claimant was thirty-seven years old on the date of the ALJ's decision; has a high school education; and has past work as a housekeeper, painter, landscape laborer, and server.  (R. 121, 272, 286).

*Mental and Physical Impairments*

On February 28, 2012, the claimant visited Dr. Paul Oleary at Capitol Care Mental Health Consult. At this time, the claimant was taking the following medications: Buspar, Celexa, Lamictal, Abilify, and Neurontin. The claimant stated that she was doing well on her medications, and that she had not had any issues with depression, paranoid thoughts, sleeping, or

weight gain. However, the claimant stated that she was having some issues focusing, and that she saw a man in the corner of her room that said her name. Dr. Oleary diagnosed the claimant with mood disorder, borderline personality disorder, and ADHD. (R. 808-809).

A few months later, the claimant returned to Dr. Oleary on May 12, 2012 and stated that she was doing "terrible." The claimant stated that she had felt overwhelmed, tired from a lack of sleep, depressed, and unmotivated for the last two days; however, she also stated that she had not taken her medicine the last two days. Dr. Oleary explained the importance of taking medication regularly. Additionally, the claimant stated that she was doing "good" and had no problems prior to not taking her medication. Dr. Oleary suggested that the claimant return in one month and did not make any changes to her medication. (R. 798-799).

Approximately one month later, on June 11, 2012, the claimant returned to Dr. Oleary complaining that her mind was "going in a number of different directions." The claimant also stated that she felt confused, disorganized, and anxious but that she had not taken her medication for the past two days. Dr. Oleary reiterated the importance of taking medicine regularly and told the claimant to take her Neurontin three times per day instead of twice per day to help with anxiety. (R. 788-790).

The claimant followed up with Dr. Oleary on July 10, 2012 and stated that she still felt disorganized and confused. The claimant also stated that she sometimes heard voices and felt depressed but not suicidal. Dr. Oleary increased the milligrams in the claimant's Lamictal medication and took the claimant off of Abilify because of her weight gain. (R. 778-779).

On October 10, 2012, the client visited Dr. Oleary to develop a plan for her anxiety. A few days later, on October 15, 2012, she returned and stated that she continued to have anxiety issues. However, she also stated that taking time "working on herself," one of the suggestions in

her anxiety plan, along with her medications helped significantly. Finally, the claimant did not report any depression, paranoid thoughts, or suicidal or homicidal ideation. Dr. Oleary noted no evidence of hallucinations. (R. 760-761).

The claimant visited to Dr. Lee Carter on December 27, 2012 at the Autauga Medical Clinic, LLC regarding her ADD symptoms and anxiety. The claimant stated that she had taken Adderall in the past, but that she had not taken the medication in the last fifteen months; that she had been sleep talking and moving things around in her house; and that she would often fall asleep immediately. Dr. Carter diagnosed the claimant with ADHD, episodic mood disorder, and anxiety; he also prescribed the claimant Ceftin 500mg, Flagyl 500mg, and Vyvanse 30mg. (R. 405-409).

On February 25, 2013, the claimant returned to Dr. Carter for a follow-up regarding her ADHD and weigh gain. Dr. Carter cited the claimant's ADHD as improving since her last visit. Dr. Carter also noted that the claimant was oriented; that her speech was fluent and words were clear; that her thought processes were coherent; that her mood was neutral; and that she was hyper with pressured speech and could not sit still. (R. 395-399).

The claimant saw Dr. Carter on May 23, 2013 for a checkup and prescription refills. The claimant stated that she was pregnant; that she was stressed and depressed about her pregnancy; and that she was having problems managing her anxiety. Dr. Carter informed the claimant about the risks of taking medications while pregnant. However, the claimant wanted to proceed against Dr. Carter's advice. Dr. Carter refilled Lamictal, Neurontin, Buspar, Lexapro 20mg, Vyvanse, and added a prescription Abilify. (R. 445-449).

Dr. Carter saw the claimant again on June 26, 2013 for a checkup and refills on June 26, 2013. The claimant complained about headaches, stress, and depression because of her

pregnancy. Dr. Carter spoke with the claimant for thirty minutes about the risks of continuing her medication while pregnant; the claimant stated that she did not want to stop taking her medication because, without it, she might result to street drugs immediately. Dr. Carter refilled the claimant's Vyvanse prescription. (R. 440-444).

In July of 2013, the claimant began seeing Dr. Lindy Harrell for opiate use disorder. The claimant continued to visit Dr. Harrell throughout 2016, and Dr. Harrell consistently refilled the claimant's prescriptions for Suboxone. (R. 832-860).

The next month, the claimant followed up with Dr. Carter on August 23, 2013. The claimant stated that she had been very moody lately and wanted her prescriptions refilled. Dr. Carter expressed continued concerns about the claimant taking medication while pregnant. The claimant stated that she was aware of the risks of taking medications while pregnant, and that her OBGYN was okay with the claimant taking her medications while pregnant if they helped keep her mood under control. Dr. Carter refilled the claimant's prescriptions for Vyvanse, Lamictal, Lexapro, Buspar, and Neurontin. (R. 435-438).

The claimant visited Dr. Muhammad Tariq at Quality of Life Health Services, Inc. as a new patient on September 30, 2013. Dr. Tariq suggested that the claimant follow up with Cherokee-Etowah-Dekalb Mental Health Center regarding her bipolar disorder and ADHD. Dr. Tariq also refilled the claimant's Vyvanse prescription. (R. 451-454). Also, before the end of September of 2013, the claimant had her baby.[2]

Based on Dr. Tariq's referral, the claimant visited C.E.D. on October 31, 2013 as a new patient seeking help for bipolar disorder and adult ADHD. The claimant also reported that she struggled with panic attacks, mood swings, anger, depression, auditory and visual hallucinations

---

[2] The record does not indicate the exact date that the claimant had her baby. But, medical records from November of 2013 state that the claimant had a newborn in the home, and records from February of 2014 indicate that the child was 5 months-old. (R. 428, 433).

(i.e., seeing ghosts), mania, and insomnia. Dr. Molly Thompson diagnosed the claimant with Bipolar I, MRE mixed with psychosis, and panic disorders with agoraphobia. Additionally, Dr. Thompson noted the claimant's Global Assessment Functioning Score as a 55. (R. 411-423).

The claimant returned to Dr. Carter for a follow up and refills on November 18, 2013. The claimant stated that she felt that her ADHD was improving, and requested blood work to check her thyroid. The claimant thought that a thyroid condition might be related to her inability to lose weight. Dr. Carter refilled the claimant's normal prescriptions and told her to return in two months or sooner, if needed.  (R. 430-433).

One week later, on November 26, 2013, the claimant went to Quality of Life complaining of swelling and back pain. Nurse Practitioner Phillip Rogers noted that the swelling occurred constantly; however, NP Rogers also noted no injury or aggravating factors. The associated symptoms included decreased mobility, joint tenderness, and muscle stiffness. Regarding the claimant's lower back pain, NP Rogers noted that the pain was worsening and occurred persistently. Changing positions, daily activities, sitting, standing, and walking all aggravated the claimant's symptoms. NP Rogers ordered a complete metabolic panel (CMP) and told the claimant to take medication as needed for both swelling and backaches. The claimant returned to receive her lab results on December 9, 2013. All lab results were within normal limits, but NP Rogers referred the claimant to a cardiologist for the swelling. (R.455-464).

On January 20, 2014, the claimant followed up with Dr. Carter. Dr. Carter documented that the claimant's condition was improving, and that she had been able to perform more daily living activities since her last visit. Dr. Carter also noted that the claimant was still going to a suboxone clinic, and that she was struggling not to return to drugs because her children were causing her stress. Dr. Carter refilled the claimant's prescriptions. (R. 425-429).

Dr. Carter saw the claimant again on February 24, 2014 for a follow-up visit and prescription refills; however, while there, she became upset and began to cry about her son's behavior and attitude toward her. She stated that she was struggling to stay clean because of the stress of her children. Dr. Carter noted that claimant's legs and entire body were swollen. Dr. Carter suggested that the claimant's medications, or a mixture of her medications, might be causing the swelling; however, the claimant refused to tell Dr. Carter what medications she was taking. (R. 545-549).

On March 18, 2014, the claimant visited the Gadsden Regional Medical Center complaining of swelling in lower legs and back. The claimant left before receiving treatment. (R. 561-564). One week later, on March 25, 2014, the claimant visited NP Rogers at Quality of Life again for swelling. NP Rogers noted that the claimant's swelling was moderate and worsening; that the claimant did not respond to elevation or rest; and that the swelling is associated with decreased mobility, fatigue, and weight gain. NP Rogers also noted that the claimant did not see a cardiologist about her swelling, as instructed to do at the last appointment, because she was "scared over what they might find." NP Rogers refilled the claimant's medications and referred her to a cardiologist again. (R. 465-469).

A couple of weeks later, on March 31, 2014, the claimant visited Dr. Godfree at Health Port for backpain. Dr. Godfree prescribed Bumex for the claimant's swelling and Tylenol. (R. 497).

On April 10, 2014, the claimant visited Dr. Darryl Prime at Southern Cardiovascular Associates based on a referral from Dr. Carter. Dr. Prime noted that the claimant had profound lower extremity edema related to her last pregnancy, discoloration of the distal feet, and hyper-

pigmented distal legs. Dr. Prime ordered various cardiology tests, and on April 22, 2014, Dr. Prime noted that all of the results were normal. (R. 522-524).

Five days later, the claimant visited Dr. Carter for back pain. The claimant also stated that she was stressed about her weight gain, swollen legs, and children. Dr. Carter ordered an abdominal CT scan to find the source of the swelling and referred her again to a cardiologist regarding the swelling of the claimant's lower extremities. (R. 540-544).

On April 21, 2014, the claimant returned to Dr. Godfree for swelling, and back pain. Dr. Godfree was unsure as to why the claimant continued to have back pain and swelling but stated that he would review the claimant's medical records and contact her. (R. 495).

Later that same day, the claimant went to Gadsden Regional Medical Center complaining of swelling and lower back pain, which the claimant rated a 7 on a scale of 1-10. Someone[3] at the medical center told the claimant that she was not going to give her pain medicine, but that she would evaluate the claimant's leg for edema and pain. When a nurse went into the patient's room to draw blood, the nurse discovered that the claimant had taken her belongings and left. (R. 553-557).

Next, the claimant saw Dr. Carter on May 13, 2014 for depression. The claimant also stated that she was stressed about her weight gain and swollen legs. Dr. Carter diagnosed the claimant with malaise and fatigue, anxiety, and major depressive disorder. Dr. Carter also gave the claimant Brintellix samples to try for her depression. (R. 535-539).

On June 10, 2014, the claimant followed up with Dr. Carter. Dr. Carter also noted that the claimant had lost some weight since her last visit, and that the claimant's swelling had gone down in her legs and back after she stopped taking her pain medications. Finally, Dr. Carter noted that the claimant's children were causing a lot of stress in her life, and that she was

_____
[3] The record does not indicate exactly who spoke to the claimant.

struggling to remain clean. Dr. Carter updated the claimant's diagnoses to include major depressive order, episodic mood disorder, anxiety, and attention deficit with hyperactivity. He also refilled the claimant's Brintellix, Klonopin, and Vyvanse prescriptions. (R. 530-533).

Next, on August 13, 2014, the claimant returned to Dr. Carter for swelling in her ankles. Dr. Carter noted that the claimant had lost some weight and that the swelling had gone down in her legs likely because the claimant was taking less pain medication. (R. 827-831).

Approximately one month later, on September 11, 2014, the claimant saw Dr. Carter her for depression. Dr. Carter noted that the claimant's swelling had improved significantly, but that the claimant was still stressed and unable to sleep throughout the night. Dr. Carter made a referral for a sleep study. (R. 822-825).

On October 8, 2014, the claimant saw Neurologist Samuel Fleming.[4] Dr. Fleming reported that the claimant appeared with adequate hygiene; presented no unusual mannerisms or motor activity; was cooperative during the evaluation; presented with spontaneously produced and rapid speech; and exhibited symptoms of both mania and depression. Dr. Fleming also noted that the claimant was oriented; that her concentration and attention were marginally adequate; that the claimant could count backwards from twenty to one but could not perform serial sevens; that the claimant could solve relatively simply subtraction and multiplication problems; that the claimant's immediate recall of digits and objects was adequate with the claimant recalling five digits forward, four digits backward, and five of five objects; and that the claimant's recent memory was adequate but that her remote memory was deficient with only three to five objects recalled within five to ten minutes. The claimant reported that she sees ghosts at least once a week; has seen demons in the past; has a mirror in her house that moves; and that she has some paranoia. (R. 389-392).

---

[4] The record does not indicate whether this appointment was a referral.

Based on the above, Dr. Fleming stated that the claimant was functioning in the low-average range of intellectual abilities; that he would not expect the claimant's condition to improve significantly as long as she is not under the care of mental health practitioner; that the claimant would not be able to respond appropriately to supervision and work pressures; and that the claimant does not seem capable of functioning independently, managing financial benefits, or understanding, carrying out, or remembering instructions. Dr. Fleming diagnosed the claimant with Bipolar disorder, polysubstance abuse, antisocial personality disorder, high blood pressure, and nausea. (R. 392-393).

On October 9, 2014, Dr. Estock evaluated the claimant's for her disability determination, and found the following impairments: affective mood disorder, personality disorders, substance addition disorders, anxiety disorders, and ADD/ADHD. He noted that the following abilities were not significantly limited: remember locations and work-like procedures; understand and remember short and simple instructions; perform activities within a schedule; and make simple-work related decisions. He found the following abilities to be moderately limited: carry out detailed instructions; work in coordination without others without being distracted; interact appropriately with the general public, and accept instructions and respond appropriately to criticism. (R. 127-137).

On April 13, 2015, the claimant returned to Dr. Carter for her depression, anxiety, and feeling overwhelmed because of her children. The claimant also told Dr. Carter that she was still visiting the suboxone clinic in Gadsden. Even though the claimant's swelling had improved significantly since her last visit, Dr. Carter advised the claimant to stop the suboxone because it was likely still causing some swelling in her legs. The claimant stated that she could not stop

taking the medication. Finally, Dr. Carter updated the claimant's diagnoses to include insomnia, depression, anxiety, edema, malaise and fatigue, and episodic mood disorder. (R. 819-820).

Based on a referral from Dr. Carter, the claimant saw Dr. Spotnitz at Neurological Specialist, P.C. on May 4, 2015. Dr. Spotnitz noted that the claimant's history was questionable, and that she seemed motivated to answer questions in a manner that would indicate she had narcolepsy. Based on the claimant's description of her excessive sleepiness, Dr. Spotnitz stated that the claimant possibly had obstructive sleep apnea with a history of apneic episodes, and that he could not rule out the possibility of narcolepsy. Finally, Dr. Spotnitz noted that the claimant was taking suboxone and clonazepam, both of which promote sleepiness. (R. 870-871).

On January 11th and 15th, 2016 Dr. Spotnitz performed sleep studies again and diagnosed the claimant with sleep apnea and obstructive sleep apnea respectively. On January 18th, the claimant returned for a follow-up, and Dr. Spotnitz noted that the claimant appeared to be getting 4 ½ to 7 ½ hours of sleep per night two-thirds of the time and 8 ½ to 9 ½ hours of sleep one-third of the times. Dr. Spotnitz told the patient to follow up in four weeks. (R 864, 874-877).

The claimant returned to Dr. Spotnitz's office on April 26, 2015, and Dr. Spotnitz noted that the claimant was "essentially not using her [CPAP] machine." The claimant stated that she is too sleepy and often falls asleep before she can remember to take her machine. (R. 861).

*The Claimant's Disability Report*

As a part of her application, the claimant completed a Disability Report detailing the timeframes and demands of her past employment. In this report, the claimant stated that she had performed housekeeping in the past, which required her, in a day's time, to walk and sit for 1 hour; stand for 1.5 hours; write or handle small objects for 3 hours; crouch for a 30 minutes;

reach for 15 minutes; climb, handle large objects, stoop, kneel, and crawl for 0 hours; lift no more than 10 pounds; and use no machines, tools, equipment, or technical knowledge or skills. (R. 272-273).

*The ALJ Hearing*

The ALJ hearing took place on August 31, 2016 via video conference. At the hearing, the claimant and Vocational Expert John Long Jr. testified. The claimant testified that she lived in a home with her four children; that she has a driver's license but could not drive long distances; and that she has her GED and some online college education. (R. 96-100).

Regarding the claimant's alleged impairments, the claimant stated that she has various issues including obesity, swelling in her legs, sleep apnea, depression, ADHD, and bipolar disorder. (R. 99, 112-115). The claimant stated that her physical issues make it hard for her to complete simple tasks. For example, she stated that she sometimes could not lift her legs to put on her underwear; that mopping was very challenging; that she cannot sit for long periods of times to do laundry unless she has a heating pad; and that she would sometimes have to roll her chair to the dishwasher to do the dishes. However, when asked how long she could stand without the pressure being too much on her legs, the claimant responded, "about two hours" and then stated that she had recently done so at a football game. (R. 108, 111, 118-119).

The claimant stated that her sleep apnea often made it hard to complete tasks. She stated that she once fell asleep driving to Birmingham, and that she recently fell asleep with her face in a cereal bowl. The claimant stated that, "on a good day," she might fall asleep about three times, but on bad days, she would fall asleep nearly every time that she sat down; however, the claimant also stated that she is unable to sleep at night. (R. 113-115).

Regarding the claimant's mental impairments, she stated that she often had issues remembering tasks and completing tasks. For example, the claimant stated that she once told her children that she would take them to look at mouthpieces and gloves for football, but that she forgot to do so the next day. She also stated that she could have a sticky note in the bathroom reminding her to call someone and that thirty minutes to an hour later she would forget to do so. (R. 109-110).

Next, the claimant stated that her daily activities involve getting up at 6:00 am to get her children ready for school, "fighting to get better," and trying not to fall asleep. She stated that she does not transport her children to and from school; instead, a helpful neighbor whom she calls "Pop" transports the children for her. She stated that her neighbor does all of her yardwork, occasionally helps with house chores, and helps her to stay on a schedule. (R. 111-114).

Additionally, the claimant testified that she had past work experience as a cashier at movie gallery, server, and landscaper and housekeeper respectively. As a cashier, the claimant made sure that the movies were stocked in the cases, cleaned, and conducted sells. As a server, the claimant stated that she performed the typical duty of tending to customers. As a landscaper and housekeeper, the claimant would cut grass, weed-eat, paint, clean the home, and perform yardwork such as gardening. She stated that she performed this work for six to twelve hours per day. When asked why the claimant stopped performing work as a landscaper and a housekeeper, the claimant responded that the work "ran out." (R. 101-102, 104, 106).

Regarding the claimant's past work as a landscaper and housekeeper, she stated that she did not believe she could do this type of work today because the work was hard back in 2014, and she was afraid that she would "disappoint." Upon elaboration, the claimant stated that she felt like she lies to people; would not be able to keep a set schedule; and does not like to be

around people that she does not know. She also stated that the swelling in her legs would prevent her from doing the work because she can no longer squat. Her attorney also asked her for her number one reason that she could no longer perform her past work. The claimant stated that her sleeping and inability to get out of the house because of depression would prevent her from working. (R. 106-107, 119).

Finally, Vocational Expert John Long Jr. testified about available jobs that the claimant could perform. First, the ALJ asked Mr. Long to categorize the claimant's work for the past fifteen years. Mr. Long stated that a housekeeper is classified as light; that a painter is classified as medium; that a landscaper is classified as heavy; and that a server or waitress is classified as light. (R. 121).

Next, the ALJ asked Mr. Long to assume a hypothetical individual with the claimant's age and education who can perform at the light exertional level with the following limitations: no climbing ladders, ropes or scaffolds; frequent climbing of ramps and stairs; frequent balancing, kneeling, crouching crawling, and stooping; no concentrated exposure to extreme heat and cold; no exposure to hazardous machinery; can understand and remember short and simple instructions but is unable to do so with detailed or complex instructions; can do simple, routine, repetitive tasks but is unable to do so with detailed or complex tasks; no more than occasional contact with the general public and only casual superficial contact with coworkers; can handle changes in the workplace if introduced gradually and well-explained; and may be expected to miss one day per month because of impairments. Mr. Long responded that the hypothetical individual could work as a housekeeper, as well as a production assembler with 2,000 jobs in Alabama and 125,000 jobs nationally; a small product assembler with 2,000 jobs in Alabama and 125,000 jobs

nationally; and a hardware or cutlery assembler with 300 jobs in Alabama and 30,000 jobs nationally. Mr. Long stated that all of these jobs were unskilled. (R. 121-122).

As a second hypothetical, the ALJ added a limitation to the first hypothetical. This individual, because a combination of medical conditions, side effects of medication, and psychological symptoms, can sustain sufficient concentration, persistence, and pace to do simple, routine tasks on a regular, continuing basis but for no more than one-half of an eight-hour workday. Mr. Long stated that, if this hypothetical individual were only able to maintain that persistence and pace for only one-half the day, she would not be able to work at any level at any job. (R. 122-123).

*The ALJ Decision*

On January 12, 2017, the ALJ issued a decision finding the claimant "not disabled." First, the ALJ found that the claimant met the insured status requirements through June 30, 2015, and that the claimant had not engaged in substantial gainful activity since September 30, 2015, the alleged onset date. The ALJ also found that the claimant had the following severe impairments: obstructive sleep apnea (OSA), obesity, bipolar disorder, ADHD, personality disorder, anxiety disorder, depressive disorder, and opiate use disorder. (R. 24).

Next, the ALJ found that the claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Regarding the claimant's OSA, the ALJ noted no direct listing for OSA but acknowledged that he was required to evaluate this impairment under the Listings of any other body system that is affected by OSA. Ultimately, to support his finding, the ALJ found no evidence in the record of the claimant's OSA causing listing-level limitations on any other body system. (R. 25).

Next, the ALJ evaluated the claimant's obesity and found that the claimant's obesity, in combination with any other impairment, did not meet the criteria of any listing. The ALJ found that the claimant's obesity was not so severe as to prevent effective ambulation, effective reaching, or general orthopedic or postural maneuvers. However, the ALJ noted that the claimant's obesity, in combination with her other impairments, did reduce her ability to do the following: lift and/or carry more than 20 pounds occasionally and 10 pounds frequently; climb ladders, ropes, or scaffolds; climb ramps or stairs more than frequently; and balance, kneel, crouch, stoop, or crawl more than frequently. As a result, the ALJ adjusted the claimant's RFC to light exertional work. (R. 25).

The ALJ also determined that the claimant's mental impairments, when considered singly and in combination, did not meet or medically equal the criteria of listings 12.04, 12.06, 12.08, and 12.09. Specifically, the ALJ stated that the "Paragraph B" criteria were not satisfied because the claimant only had moderate restrictions in her daily activities; social functioning; and concentration, persistence, or pace. Additionally, the ALJ noted no evidence of any episodes of decomposition. To support this finding, the ALJ noted that, despite the claimant's signs, symptoms, and limitations resulting from her mental impairments, the claimant was still capable of getting her children ready for school; transporting her children to and from school; preparing complete meals; caring for her personal needs; washing dishes; doing laundry; driving; going out; shopping; paying her bills; counting change; using a checkbook; and using a computer to take online college classes.

To support this finding, the ALJ also relied on the Dr. Estock's opinion where he stated that the claimant's mental health impairments did not cause any more than moderate limitations in any mental health functioning; that the claimant was capable of understanding, remembering

and carrying out simple instructions; that she could maintain attention and concentration for two-hour periods with all customary breaks; that she could tolerate occasional contact with the public and coworkers; and that she could handle gradual changes in the workplace. Dr. Estock supported his own opinion by noting that the claimant drives, obtained her GED, handles her own finances, and shops in stores. (R. 25-26).

Additionally, the ALJ determined that "Paragraph C" criteria were not satisfied. To support his finding, the ALJ noted that the medical evidence did not show more than minimal limitations in the claimant's ability to do basic work activities nor repeated episodes of decompensation, a residual disease process that has resulted in such marginal adjustments that even a minimal increase in mental demands or change would cause decompensation, or a history of one or more years' inability to function outside a highly supportive living arrangement. Regarding the claimant's anxiety, the criteria was not met because the evidence failed to show that the claimant had the complete inability to function independently outside the area of the home. (R. 26).

Next, the ALJ found that the claimant had the RFC to perform light exertional work with the following clarifications and exceptions: no climbing ladders, ropes or scaffolds; frequent climbing of ramps and stairs; frequent balancing, kneeling, crouching crawling, and stooping; no concentrated exposure to extreme heat and cold; no exposure to hazardous machinery; can understand and remember short and simple instructions, but is unable to do so with detailed or complex instructions; can do simple, routine, repetitive tasks but is unable to do so with detailed or complex tasks; no more than occasional contact with the general public and only casual superficial contact with coworkers; can handle changes in the workplace if introduced gradually and well-explained; and may be expected to miss one day per month due to impairments. (R. 27).

In making this finding, the ALJ considered all symptoms and the extent that the symptoms could reasonably be accepted as consistent with the objective medical evidence, other evidence, and opinion evidence. Ultimately, the ALJ determined that the claimant's testimony, allegations of pain, and allegations of functional restrictions were disproportionate to the objective medical evidence. In supporting this finding, the ALJ noted that the claimant did not stop working because of her alleged disability, but instead because the work "ran out." Additionally, the claimant's mental impairments, for which she received treatment for, do not preclude all work activity, as treatment records from Dr. Oleary and Carter indicate that the claimant's status during these examinations was largely normal and her medications were helping her symptoms. Furthermore, the claimant's Global Assessment of Functioning was 55, which is indicative of the presence of only modern symptomology. Finally, many of the claimant's treatment records indicate that she was only present for prescription refills. (R. 27-28).

Regarding the claimant's physical symptoms, the ALJ noted that treatment records from Dr. Cater documented persistent edema; however, no evidence indicated decreased muscle strength or range of motion. Additionally, the ALJ stated that the records indicated that the claimant was able to perform most of her daily activities. Finally, the ALJ stated that records from 2014 indicate that the claimant's swelling was improving, and that the claimant left the Gadsden Regional Medical Center twice before receiving medical treatment or an evaluation. (R. 29).

Regarding the claimant's sleep apnea, the ALJ supported his finding by noting that the claimant was largely non-complaint with her treatment as she was not using her CPAP machine.

The ALJ noted that the only other relevant evidence was the opinion of Dr. Fleming, to which the ALJ gave little weight because it was not supported by the evidentiary record as a whole. To support his finding, the ALJ stated that the treatment records from the claimant's primary care physicians did not document the symptoms and limitations that the claimant reported to Dr. Fleming during this one-time examination where she was diagnosed the claimant with hypertension with associated nausea and fainting spells. As an example, the ALJ noted that the treatment records from Dr. Carter, Dr. Harrell, and CED contain no documentation of the following symptoms that the claimant reported to Dr. Fleming: frequent crying spells, suicidal ideation, excessive spending, over eating, and hyper activity. Regarding the claimant's treating physicians, the ALJ gave Drs. Carter, Grant, Oleary, Prince, Harrell and Spotnitz substantial weight. Additionally, the ALJ gave Dr. Estock's opinion, that the claimant's impairments cause moderate limitations, great weight because the evidentiary record as a whole supported his opinion. (R. 31-32).

Finally, based on the claimant's RFC and the vocational expert's testimony, the ALJ found that the claimant could perform her past work as a housekeeper, as well as other jobs in the national economy. Ultimately, the ALJ determined that, based on the testimony at the hearing and the medical evidence, the claimant was not disabled under the Social Security Act. (R. 33).

*Evidence Submitted to Appeals Council*

On April 10, 2017, four months after the ALJ decision, Dr. Wilson performed a psychological evaluation of the claimant at her attorney's request. Dr. Wilson stated that he reviewed "summaries of [the claimant's] medical and psychiatric records" that her attorney provided. Dr. Wilson began his report by summarizing the claimant's previous diagnoses. He noted that Dr. Oleary diagnosed the claimant with mood disorder, Bipolar II, and ADHD in

2012; that CED diagnosed the claimant with Bipolar I, MRE mixed with psychosis, and panic disorder with agoraphobia in 2013; and that Dr. Fleming diagnosed the claimant with Bipolar Disorder, polysubstance abuse disorder in remission, and antisocial personality disorder in 2014. Dr. Wilson also noted that Dr. Fleming stated that the claimant "was not capable of managing benefits or functioning independently" and "would not be able to respond appropriately to supervision, coworkers, and work pressure given her emotional problems." (R. 84).

Next, Dr. Wilson noted that the claimant stated she began her recovery with Dr. Lindy Harrell, who prescribed the claimant's suboxone. The claimant described a series of events such as an unrelated car accident, abuse, and physical injuries that lead to various hospital visits and her opioid addiction; however, the claimant stated that she had been clean for the past 4 ½ years. Dr. Wilson also asked the claimant about her daily activities. The claimant responded that she typically gets up and gets her children ready for school. Afterward, the claimant sits at home with her new born and will try to do small tasks like laundry; however, the claimant stated that she often falls asleep. (R. 84-88).

Regarding her mental status, the claimant stated to Dr. Wilson that she experienced panic attacks that often resulted in chest pains, shortness of breath, crying, and shaking. She also stated that she gets very little sleep, and that she normally stops breathing before she can put her mask on for her sleep apnea.

Dr. Wilson performed a Cognition and Memory Screen in which he noted that the claimant was able to count down from 20 with no errors; able to perform serial 3's to 24; able to do simple math and a more complex calculation; able to recall zero items after ten minutes; and able to recall only five digits forward and three digits backward. Dr. Wilson noted that the

claimant had adequate mental control and attention, but that the claimant has serious problems with short term memory and working memory.

Dr. Wilson's summary states that the claimant may be "the most scattered" individual that he had evaluated in years as he was unable to obtain coherent information from the claimant. He stated that he could "not imagine any way that she could function in a competitive work environment." Dr. Wilson labeled the claimant's ability to withstand the pressures of day to day occupational functions and her ability to think clearly and retrieve information as "highly impaired." Dr. Wilson ultimately diagnosed the claimant with Bipolar Disorder with psychotic features, ADHD, post-traumatic stress disorder, a history of polysubstance dependence (but has been clean for 4 years), back and leg problems, and sleep apnea. (R. 88-90).

Based on the above diagnoses, Dr. Wilson circled "no" when asked if the claimant could do any of the following: understand, remember, or carry out simple instructions; maintain concentration and pace for at least two hours; perform activities within a schedule and be punctual; sustain an ordinary routine without supervision; adjust to routine work changes; interact with supervisors; interact appropriately with co-workers; and maintain socially appropriate behavior. Finally, he stated that the claimant would likely be off task 80% of the work day, and that he would expect the claimant to fail to report to work because of her psychological symptoms 30 days per month. (R. 92).

## VI.    DISCUSSION

### *Reviewing Post-Hearing Evidence*

The claimant argues that the Appeals Council erred by not reviewing Dr. Wilson's post-hearing evaluation on the ground that it did not relate back to the period at issue. This court

disagrees. Even assuming arguendo that the evidence was chronologically relevant, the evidence was neither new nor material.

Dr. Wilson's evaluation did not provide new, noncumulative evidence. *See Clough*, 636 F. App'x at 498. Dr. Wilson diagnosed the claimant as suffering from Bipolar Disorder with psychotic features, ADHD, post-traumatic stress disorder, a history of polysubstance dependence, back and leg problems, and sleep apnea. (R. 90-91). However, all of these diagnoses were also rendered by other doctors prior to the ALJ decision. In fact, because the ALJ had medical records from Dr. Carter, Dr. Oleary, and Dr. Fleming with these same diagnoses, the ALJ found that the claimant suffered from severe bipolar disorder, ADHD, personality disorder, anxiety, depression, and opiate use disorder. Dr. Wilson's evaluation only provides cumulative evidence of the claimant's impairments; thus, the evidence is not new.

Dr. Wilson's opinion was also immaterial because, if accepted, there was no reasonable possibility that it would change the administrative result. *See Washington,* 806 F.3d at 1322; *Hargress,* 803 F.3d at 1310. In *Hargress*, the Court held that evidence was not material because the post-hearing evaluation was inconsistent with medical records created during the relevant time period. 803 F.3d at 1310. In other words, the opinion was inconsistent with the substantial evidence. *See id.* Dr. Wilson's evaluation is also inconsistent with the medical records created during the relevant time. Although the claimant has had struggles with her impairments, her medical records indicate that her conditions were improving.

For example, in February of 2012, the claimant visited Dr. Oleary about hallucinations and anxiety, but the claimant's appointments in May, June, and July of 2012 indicate that her condition was improving when she was compliant with her medication and treatment plans. (Exhibit 11F). Similarly, the claimant visited Dr. Carter for ADHD, swelling, weight gain, and

depression; however, records from February and November of 2013 indicate that the claimant's ADHD was improving; records from September of 2014 indicate that the claimant's swelling had improved significantly; and records from June and August of 2014 state that the claimant had lost some weight. (R. 819-825). Additionally, the claimant's medical records and testimony repeatedly indicate that her children were the primary source of her stress and depression. (R.117). In 2016, Dr. Spotnitz noted that the claimant's sleep apnea was not improving because she was significantly non-compliant with her treatment. (R. 861). Ultimately, Dr. Wilson's opinion that the claimant could not function in a competitive work environment is inconsistent with the substantial evidence from the relevant time period, which indicates that the claimant only has moderate limitations. As a result, there is no reasonable possibility that the evidence would change the administrative result; thus, the evidence is not material. *See Hargress*, 803 F.3d at 1310. Overall, the Appeals Council properly decided not to review the evidence.

*Articulating the Weight Given to Physicians' Opinions*

The claimant argues that the ALJ did not clearly articulate why he gave Dr. Fleming's consultative evaluation little weight. This court disagrees.

The ALJ clearly articulated the grounds for affording Dr. Fleming's opinion little weight when he noted that the claimant's Global Assessment Functioning Score was 55; that the claimant testified at the hearing that she could perform some daily activities and selfcare including completing online college courses, taking care of her children, driving, shopping, standing at football games for two hours, getting her children ready for school, and performing house chores; and that the claimant's treatment records from her primary physicians did not document the symptoms and limitations that the claimant reported to Dr. Fleming, such as hypertension with associated nausea and fainting spells. (R. 30-31).

Additionally, substantial evidence supports the ALJ's rationale. As noted by the ALJ, the claimant's records from Dr. Oleary show that the claimant's medications significantly helped her mental impairments when she was complaint, and that no evidence suggested hallucinations. (R. 28). Additionally, Dr. Carter noted in January of 2014 that her ADHD had improved. (R. 29). Finally, regarding the claimant's stress, sleep apnea, and anxiety, the ALJ noted that the claimant repeatedly indicated during her appointments that her children were the cause of her stress; was later diagnosed with sleep apnea but was not complaint with her treatment; and the ALJ recognized the claimant's anxiety as a severe impairment and adjusted her RFC based on her mental impairments. (R. 26-29).

Ultimately, because the ALJ clearly articulated his reasons for giving Dr. Fleming little weight, and substantial evidence supports his decision, the ALJ did not commit a reversible error.

*Determining that a Claimant Can Perform Past Relevant Work*

The claimant argues that the ALJ's finding that the claimant could perform her past work as a housekeeper is not supported by substantial evidence because the ALJ failed to develop the requirements of the claimant's past work. The court disagrees.

The record sufficiently documents the requirements of the claimant's past relevant work. The claimant completed a disability report in which she stated the specific requirements for her job as a housekeeper. (R. 272-273). This evidence sufficiently demonstrates the demands of the claimant's past work. *See* SSR 82-62, 1982 WL 31386 at *3.

The ALJ also relied on the testimony of the vocational expert, who testified that housekeeping was within the claimant's RFC of lightwork, and that housekeeping jobs were available in the national economy. And, any error committed by the ALJ at step four is a

harmless error because the ALJ properly found that the claimant could perform other work. *See generally Perry v. Astrue*, 280 F. App'x 887, 893 (11th Cir. 2008) ("We will disregard any errors or defects in the lower court that "do not affect any party's substantial rights.") (citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (explaining that when an incorrect factual finding results in harmless error because the correct finding would not contradict the ultimate findings, the ALJ's decision will stand)); *Holder v. Berryhill*, No. 4:17-CV-318-VEH, 2018 WL 1857061 (N.D. Ala. Apr. 18, 2018) ("[W]hen an ALJ has committed error at step four, it may be harmless error if his alternative finding at step five is correct."). Ultimately, the ALJ properly relied on the claimant's Disability Report, that details all of the physical and mental requirements of the claimant's job as a housekeeper, and the vocational expert's testimony to determine that she could perform her past work as a housekeeper.

### Using a Vocational Expert's Testimony as Substantial Evidence

Finally, the claimant argues that the ALJ's finding of no disability is not supported by substantial evidence because the first hypothetical question, upon which the vocational expert based his testimony, omitted the claimant's moderate limitations in maintaining concentration, persistence, and pace. The court disagrees.

A hypothetical question does not have to explicitly contain the precise words "concentration, persistence, and pace" to account for limitations involving these areas. *See Winschel*, 631 F.3d at 1180. For example, the Eleventh Circuit has found a hypothetical to be adequate where the ALJ accounted for moderate difficulties in maintaining concentration, persistence, or pace by limiting the claimant to "one to three step non-complex tasks, consistent with the RFC assessment." *Jacobs,* 520 F. App'x at 951. Similarly, here the ALJ limited the claimant's work to "simple, routine, repetitive tasks . . . [with no] detailed or complex tasks." (R. 121).

Most importantly, the hypothetical question that the ALJ posed adequately accounted for the claimant's limitations in concentration, persistence, and pace because it implicitly accounted for these limitations by limiting the question to unskilled work. *See Jacobs*, 520 F. App'x at 951. ("[L]imiting the hypothetical questions to include only unskilled work sufficiently accounts for the claimant's limitations in maintaining his concentration, persistence, or pace where the medical evidence demonstrates that the claimant can engage in simple, routine tasks or unskilled work despite his limitations."). The vocational expert's response, where he stated that the claimant could perform work as a production assembler, small product assembler, and an assembler of hardware and cutlery, all of which the vocational expert classified as unskilled work illustrates the implicit accounting of the claimant's limitations.

Thus, because the question posed to the vocational expert adequately addresses the claimant's limitations, the ALJ properly relied on the vocational expert's testimony as substantial evidence that the claimant could perform other jobs in the national economy.

## VII. CONCLUSION

For the reasons above, this court concludes that the decision of the commission should be AFFIRMED. The court will enter a separate order in accordance with the Memorandum Opinion.

DONE and ORDERED this 22nd day of March, 2019.


_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE